UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
14 CV 5498
-----------------------------------------------------------X

RICHARD NATOFSKY,

                       Plaintiff,

                -against-

THE CITY OF NEW YORK, SUSAN POGODA,
SHAHEEN ULON, MARK PETERS,  and JOHN
and JANE DOE (said names being fictitious, the
persons intended being those who aided and abetted
the unlawful conduct of the named Defendants),

                    Defendants.

-----------------------------------------------------------X

**COMPLAINT**

Docket No.

**JURY TRIAL
REQUESTED**

Plaintiff, **RICHARD NATOFSKY** ("Plaintiff"), by his attorneys,

**MADUEGBUNA COOPER LLP,** for his complaint alleges:

## I    THE NATURE OF THIS ACTION

1.    This is an action for declaratory judgment and money damages to

remedy discrimination and retaliation on the basis of disability and age in the

terms, conditions and privileges of employment under Section 504 of the

Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 701 *et seq.*; Title I

of the Employee Retirement Income Security Act of 1974 ("ERISA"), 20 U.S.C. §

1001 *et seq.*; New York Human Rights Law as contained in New York State

Executive Law, § 296 *et seq.* ("NYHRL"); and New York City Human Rights Law

as contained in the Administrative Code of the City of New York, § 8-107 *et seq.* ("NYCHRL").

2.      This action is being brought to vindicate the human and civil rights of Plaintiff. Plaintiff contends that the terms, conditions and privileges of his employment relationship with Defendant, THE CITY OF NEW YORK ("City"), were adversely affected, in part, because of his disability and age, and in retaliation for his complaints of disability discrimination.

## II      JURISDICTION AND VENUE

3.      The court's jurisdiction is invoked pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has supplemental jurisdiction over the state causes of action pleaded.

## III      PROCEDURAL REQUIREMENTS

4.      Prior to commencement of this action, Plaintiff served a copy of the complaint upon the New York City Commission of Human Rights and the Corporation Counsel of the City of New York in accordance with New York City Administrative Code Section 8-502 (c).

## IV      PARTIES

5.      Plaintiff is a 57 year old, disabled white male; a citizen of the United States and a resident of the City and State of New York.

6.     Defendant City is a municipal corporation existing under and by virtue of the laws of the State of New York.

7.     NEW YORK CITY DEPARTMENT OF INVESTIGATION (hereinafter "DOI") is an agency or department of the City, duly existing by reason of, and pursuant to, the laws of the City and State of New York.

8.     At all relevant times, Defendant SUSAN POGODA ("POGODA") was employed by the City as Deputy Commissioner of Agency Operations/Chief of Staff of DOI.

9.     Defendant POGODA is sued here both in her personal and official capacities.

10.     At all relevant times, Defendant SHAHEEN ULON ("ULON") was employed by the City as the Deputy Commissioner of Administration of DOI.

11.     Defendant ULON is no longer with DOI, having resigned from her employment on May 1, 2014.

12.     Defendant ULON is sued here both in her personal and official capacities.

13.     At all relevant times, Defendant MARK PETERS ("PETERS") was employed by the City as the Commissioner of DOI.

14.     Defendant PETERS is sued here both in his personal and official capacities.

## V.   FACTS COMMON TO ALL CAUSES OF ACTION

*Plaintiff's Hearing Impairment and Disability:*

15.    Since infancy, Plaintiff has been diagnosed with a severe sensorineural hearing loss in both ears, a hearing impairment and a physiological disorder which substantially affects a special sense organ (the ears), and impairs Plaintiff's hearing, speaking and listening skills, and requires periodic audiological evaluations to monitor Plaintiff's hearing sensitivity and hearing aid functioning.

16.    Due to his disability, even with hearing aids, Plaintiff's ability to hear and listen is substantially limited.

17.    Despite his disability, Plaintiff worked exceptionally hard, persevered, and did well academically, earning a Bachelor's degree in Business Administration from Baruch College and a Master's degree in Business Administration from St. John's University.

18.    At all relevant times, Defendants were aware of Plaintiff's hearing impairment and disorder.

19.    Despite Plaintiff's hearing impairment, Plaintiff has always effectively discharged the duties and responsibilities of his employment.

*Plaintiff's Extensive Skill, Qualification and Experience:*

20.    Plaintiff has been employed as a public servant for more than 28 years.

21.    As hereinafter specifically alleged, Plaintiff achieved a long and

- 4 -

distinguished career with Defendant City, earning good and outstanding performance reviews, several promotions as well as increased responsibilities at each level.

22.     In 1986, Plaintiff began his employment with Defendant City, as a Project Coordinator of Home Care Services in the New York City Human Resources Administration ("HRA").

23.     Between 1988 and 2012, Plaintiff was an employee of three public agencies – the New York City Housing Authority ("NYCHA"), the New York City Transit Division of the Metropolitan Transportation Authority ("MTA") and the New York City Department of Transportation ("DOT").

24.     In 1997, Plaintiff earned his first managerial position as a Manager of Budget and Analysis with MTA.

25.     While at MTA, Plaintiff was twice promoted.  In 1998, Plaintiff was elevated to the position of Budget Director at MTA. About 2 years later, in 2000, Plaintiff became a Senior Manager Budget Administration and Distribution Forecasting at MTA.

26.     As Senior Manager Budget Administration and Distribution Forecasting at MTA, Plaintiff's diverse responsibilities included developing and managing the entity's annual multi-million dollar budget.

27.     In 2002, Plaintiff left MTA and joined DOT as its Director of Expense Budget and Grants Management.

- 5 -

28.    During his eleven-year tenure with DOT, Plaintiff received several merit increases, and was promoted to the position of Director of Administration, even with knowledge of and despite his disability.

29.    In recognition of his competencies and contributions, in 2005 Plaintiff was selected for entry into the citywide Management Academy Program – a program for city employees who have demonstrated superb technical competence in their areas of expertise.

30.    Between February 2011 and December 2012, Plaintiff was the Director of Administration for DOT.

31.    As Director of Administration for DOT, Plaintiff became responsible for managing the personnel activities, operational budgets, general administration and operations of the entire agency, with a workforce of more than 4,000 employees.

32.    During the course of his employment with DOT and MTA, including his positions as Director of Budget and Director of Administration, Plaintiff was granted a number of reasonable accommodations, including being provided assistive listening devices (ALDs), such as a phone amplifier and a personal FM system, whereby speakers wear small microphones that transmit amplified sounds directly to a receiver in Plaintiff's ear, and work area adjustments (for example, a work area away from a noisy area when DOT moved to a bullpen office style).

- 6 -

33.    Despite the above workplace adjustments or modifications, throughout his employment with the City, Plaintiff must still expend extra effort, such as arriving at meetings early in order to sit in close proximity to the speaker to read his or her lips.

34.    At all relevant times, Plaintiff is usually able to use his lip reading ability to communicate individually with his co-workers. However, it is not possible for him to use lip-reading when people who are not in his line of sight are speaking.

*Plaintiff's Meritorious Performance at DOI:*

35.    In 2012, Plaintiff interviewed for the position of Director of Human Resources and Budget with DOI by a panel, which included then DOI Commissioner, Rose Gill Hearn.

36.    At the time of the interview, Commissioner Rose Gill Hearn and other interviewers at DOI were aware of Plaintiff's disability, and it was specifically noted in writing that Plaintiff is disabled and hearing impaired.

37.    Following his successful interview, in December 2012, Plaintiff was hired as Director of Human Resources and Budget for DOI.

38.    As Director of Human Resources and Budget at DOI, Plaintiff's duties and responsibilities included coordinating and implementing all human resource services for employees within DOI, representing the Commissioner at

- 7 -

citywide Human Resources meetings as well as with oversight agencies, analyzing financial data, and tracking budgetary trends to ensure proper protocols are in place.

39.     Plaintiff well discharged the functions and responsibilities of the position of the Director of Human Resources and Budget at DOI.

40.     In his position as Director of Human Resources and Budget at DOI, despite a lack of sufficient staff, Plaintiff made many contributions at DOI.

41.     In recognition of his achievements as Director of Human Resources and Budget at DOI, in December 2013, Plaintiff received merit salary increase.

42.     Based on his track record of exemplary performance, Plaintiff also received, from the former DOI Commissioner, in December of 2013, an award for going "above and beyond" at the agency's yearly award ceremony.

*ULON's Discriminatory actions*:

43.     In his role as Director of Human Resources and Budget at DOI, from December 2012 until May 2014, Plaintiff reported directly to Defendant ULON.

44.     As of December 2012, Defendant ULON was the Deputy Commissioner of Administration at DOI.

45.     Defendant ULON joined DOI in late November 2012, less than one month before Plaintiff started his employment at DOI.

46.     Defendant ULON is a white female under forty (40) years of age.

- 8 -

47.    As of December 2012, when Plaintiff joined DOI, Defendant ULON was only 34 years old, with less than eight (8) years' experience as a manager in public service.

48.    At all relevant times, Defendant ULON harbored *animus* toward Plaintiff on account of his age and disability.

49.    Defendant ULON was well aware of the nature and extent of Plaintiff's hearing loss and disability as well as Plaintiff's age and long and distinguished public service experience.

50.    Despite Defendant ULON's knowledge of Plaintiff's disability, ULON did not respond to Plaintiff's requests for reasonable accommodation and failed to accommodate Plaintiff's disability.

51.    Instead, at different times, including on or about March 22, 2013, Defendant ULON frequently criticized Plaintiff for not responding to emails while attending meetings and/or listening to someone speak.

52.    Despite Plaintiff's explanations and complaints, that due to his disability he could not respond to an email while at the same time listening to a speaker, Defendant ULON continued to criticize Plaintiff both orally and in writing for not responding to emails while attending meetings and/or listening to someone speak.

53.    At all material times, Defendant ULON showed resentment towards

Plaintiff, who was twenty years her senior, significantly more experienced, and more proficient.

54.     Despite the fact that Plaintiff was unable to take any time off during the first couple of months of his employment at DOI due to ULON's absence and in spite of the fact that the City of New York limits the number of leave days you can carry over, ULON was reluctant to approve Plaintiff's request for days off from work to enable Plaintiff take care of his personal needs.

55.     Specifically, in or about June 13, 2013, Defendant ULON attempted to deny Plaintiff's application to take leave days.

56.     In or about June 2013, Plaintiff brought Defendant ULON's refusal to approve his leave of absence to the attention of Rose Gill Hearn, the Commissioner for DOI at that time. The Commissioner told Defendant ULON to approve Plaintiff's leave days.

57.     Defendant ULON also attempted to impose limitations on Plaintiff's hours at work. For instance, on or about June 12, 2103, Defendant wanted Plaintiff to arrive work when she did, between 9:00 AM and 9:30 AM, instead of Plaintiff's usual arrival time of between 8:00 AM and 8:15 AM. Plaintiff's usual arrival time did not mean Plaintiff would depart work earlier. Rather, it just meant that Plaintiff worked a longer day, for which he neither requested nor received additional compensation at DOI or anywhere else he previously worked.

- 10 -

58.     Despite the fact that Plaintiff's early arrival to work was actually beneficial to DOI, Defendant ULON refused to allow Plaintiff to continue to arrive early, claiming that Executive Staff (which Plaintiff was considered a part of) does not arrive that early.

59.     It took Plaintiff's complaint to Commissioner Rose Gill Hearn, in or about June 2013, for Defendant ULON to allow Plaintiff to continue his beneficial practice of arriving early to work.

60.     Defendant ULON's attempt to alter Plaintiff's work schedule and prevent him from arriving to work early was motivated by discriminatory animus and based on considerations of Plaintiff's disability and age.

*PETERS and POGODA's appointment and discriminatory actions*:

61.     Due to a change in mayoral administrations, the tenure of the former administration of DOI, under Commissioner Rose Gill Hearn, ended on December 31, 2013.

62.     As a result, pending the appointment of a new Commissioner, from January 1, 2014, DOI functioned under an interim Commissioner, the First Deputy Commissioner, Victor Olds, a 62-year old black male.

63.     On February 19, 2014, defendant PETERS succeeded Rose Gill Hearn as the Commissioner for DOI.

64.     On February 20, 2014, one day after he began his tenure as DOI

- 11 -

Commissioner, Defendant PETERS announced the appointment of Defendant POGODA as DOI's Chief of Staff and Deputy Commissioner for Agency Operations.

65. POGODA has a history of discriminatory and abusive tendencies in the workplace. POGODA's reputation for being retaliatory in her management style preceded her to DOI. She is known to be intimidating and crass and uses highly inappropriate and demeaning language, such as "Bitch" in reference to City employees, including colleagues and subordinates.

66. Ever since POGODA became Chief of Staff and Deputy Commissioner for Agency Operations at DOI on February 19, 2014, POGODA has inspired a pervasive climate of fear and intimidation within the ranks of DOI employees.

67. At a meeting on April 2, 2014, soon after defendant POGODA assumed the position of Chief of Staff and Deputy Commissioner for Agency Operations for DOI, POGODA advised Plaintiff that she was aware of Plaintiff's experience with ULON, and specifically told Plaintiff that she was aware that ULON had attempted to throw Plaintiff as well as others "under the bus" but that "she (POGODA) would not let that happen."

68. Moreover, when Plaintiff expressed his concerns at the April 2, 2014 meeting that ULON, despite Plaintiff's excellent performance, would attempt to

- 12 -

issue Plaintiff a negative evaluation, POGODA assured Plaintiff that all of ULON's evaluations were "flaky," and that no evaluation would be finalized and processed without POGODA's express approval and consent.

69.    Despite POGODA's assurances, on May 1, 2014, ULON's last day with DOI, ULON in concert with POGODA submitted to Plaintiff, a written evaluation of Plaintiff's performance for the period January 1, 2013 to December 31, 2013 that unjustifiably rated Plaintiff's performance as "needs improvement" (the "May 2014 Evaluation").

70.    The May 2014 Evaluation by ULON was an inaccurate and unfair assessment of Plaintiff's work performance; did not at all address Plaintiff's accomplishments; and was based on tasks and standards Plaintiff had not been given until the very date of the May 2014 Evaluation.

71.    In the May 2014 Evaluation, ULON once again criticized Plaintiff for the timing of his response to emails, even though she had been informed on numerous occasions that Plaintiff's limitations were caused by his hearing disability.

72.    ULON's rating of Plaintiff's performance as "needs improvement" on the May 2014 Evaluation was motivated by discriminatory animus towards Plaintiff on account of Plaintiff's age and disability and was also in retaliation for Plaintiff's repeated complaints of disability.

73.   On or about May 1, 2014, upon receipt of the evaluation, Plaintiff immediately brought it to the attention of POGODA, as instructed. Despite knowing that the May 2014 Evaluation was at odds with Plaintiff's record of performance at DOI, POGODA informed Plaintiff that she essentially agreed with ULON's unfair evaluation of Plaintiff.

74.   POGODA's agreement with ULON's unfair evaluation of Plaintiff was motivated by discriminatory animus.

75.   Since May 2014, POGODA, like ULON, expressed frustration with Plaintiff's disability and limitations. POGODA was often impatient with Plaintiff's deliberate manner of speaking and whenever Plaintiff needed something repeated.

76.   At all relevant times, POGODA's statements to Plaintiff, tone, facial expressions and body language all conveyed intolerance of and discriminatory animus towards Plaintiff's disability and limitations.

77.   For example, in one-on-one meetings, on May 9, 2014, POGODA snapped at Plaintiff to hurry his speech and move on to another topic and Plaintiff's request that POGODA repeat herself. At that May 9, 2014 meeting, POGODA also snapped that I do not understand what you are saying.

78.   At different times since May 2014, POGODA has also chastised Plaintiff for not correctly hearing questions the first time and frequently stares at Plaintiff's hearing aids.

- 14 -

79.     On May 9, 2014, Plaintiff appealed ULON's May 2014 Evaluation to Defendant POGODA.

80.     In his May 9 appeal of the May 2014 Evaluation, Plaintiff not only complained to POGODA that ULON essentially treated him differently on the basis of his disability, in that ULON criticized the limitations placed on Plaintiff by his disability (severe hearing loss), but also provided POGODA with copies of his email exchange with ULON in which Plaintiff complained about being criticized for work performance caused by his disability.

81.     To date, POGODA has failed to respond to Plaintiff's appeal of the May 2014 Evaluation.

*Plaintiff's demotion, pay cut, and reassignment:*

82.     Instead, while Plaintiff was hospitalized to the knowledge of POGODA, by a letter dated May 20, 2014, POGODA acting in concert with and to the knowledge of Defendant PETERS, advised Plaintiff that effective immediately his salary will be drastically cut by almost 50% from $129,000 to $68,466, and he has been demoted from his managerial position as Director of Human Resources and Budget to his civil service title of Associate Staff Analyst with office title of "Human Resources Generalist" (non-managerial).

83.     In the letter dated May 20, 2014, POGODA advised Plaintiff that he "will be provided with the "tasks & standards" (job description) for his new

position "within one week." However, this was not done until June 6, 2014, almost 2 ½ weeks later than promised in the May 20 letter.

84.     The failure of Defendants POGODA and PEERS to provide Plaintiff with a job description for his new position made the performance of Plaintiff's duties difficult.

85.     Despite Plaintiff's demotion, due to the failure of Defendants POGODA and PETERS to provide Plaintiff with a job description for his new position, and make clear Plaintiff's job functions, other DOI employees continued to call on Plaintiff and expect him to continue acting as Director of Human Resources and Budget.

86.     As a result, by an email dated May 28, 2014, Plaintiff sought, from defendant POGODA and PETERS, clarification and guidance as to his interim functions at DOI.

87.     In the email dated May 28, 2014, Plaintiff also challenged and made known to defendants POGODA and PETERS that their decision to demote him, change his title and drastically reduce his salary, was unlawful and contrary to law.

88.     Neither POGODA nor PETERS provided Plaintiff with the clarification and guidance sought by Plaintiff through his May 28, 2014 email nor responded to Plaintiff's challenge that his demotion and salary cut was unlawful.

89.     Instead, in retaliation for Plaintiff's complaints, including his email of

May 28, 2014, Plaintiff was subjected to further differential treatment in the terms, conditions and privileges of his employment, including but not limited to unwarranted and excessive scrutiny and criticism not leveled at other employees in the Human Resources and Budget units of DOI, and continuing failure to provide Plaintiff clarity and guidance as to what his job responsibilities were for several weeks.

90.    The reduction of Plaintiff's salary and demotion of Plaintiff by Defendants POGODA and PETERS was motivated by considerations of age and disability, and in retaliation for Plaintiff's prior complaints of disability discrimination, including his appeal of the May 2014 Evaluation.

91.    The reduction of Plaintiff's salary and demotion of Plaintiff by Defendants POGODA and PETERS was also in violation of the New York City Personnel Services Bulletin (PSB), Article 3, Section 320-R (Mayor's Personnel Order No. 78/9) ("PSB 320-2R"), relating to demotion of managers.

92.    According to PSB 320-2R, managers must be given official notification of their right to appeal their demotions and salary cut and their salaries must not be reduced by more than twenty percent (20%).

93.    In the haste to reduce Plaintiff's salary and demote him, POGODA, PETERS, and others at DOI, failed to provide Plaintiff with official notification of his right to appeal to the Commissioner of the Department of Citywide Administrative Services ("DCAS"), as mandated by  PSB 320-2R.

*Plaintiff's Appeal to DCAS of his Demotion and Salary Cut*:

94.     Despite the failure to provide Plaintiff with official notification of his right to appeal, on June 18, 2014 Plaintiff appealed his demotion and reduction in salary to the Commissioner of DCAS pursuant to PSB 320-2R.

95.     In his appeal to DCAS, Plaintiff alleged that his demotion and salary reduction were made in violation of the New York City Personnel Services Bulletin, specifically PSB 320-2R.

96.     In addition, Plaintiff's June 18 letter advised DCAS that his demotion and reduction in salary was for discriminatory and retaliatory reasons in that he was singled out and treated differently based on a number of unlawful considerations.

97.     On or about June 27, 2014, DCAS responded to plaintiff's appeal, agreed that Plaintiff salary was improperly reduced by DOI to $68,466 instead of $88,649, that DOI has informed them that Plaintiff's salary is being adjusted, but nonetheless inexplicably determined that the policy and procedures of PSB 320-2R were followed by DOI in plaintiff's change in managerial level and reduction in salary.

98.     The June 27 response from DCAS wholly failed to address the complaints of discrimination and the issues implicated in Plaintiff's demotion and unlawful reduction of her salary by POGODA and PETERS.

99.    Contrary to the June 27 DCAS response, Plaintiff's salary was not being adjusted at DOI, and to date Plaintiff's salary remains at the drastically reduced amount of $68,466 instead of $88,649.

*Plaintiff's Humiliation, Embarrassment and Hostile Work Environment:*

100.    The decision to demote Plaintiff to his civil service title and drastically reduce his pay was intentionally calculated to humiliate and embarrass Plaintiff, deliberately create an intolerable workplace environment, and compel Plaintiff to resign his employment with DOI.

101.    Demoting Plaintiff to the civil service title of Associate Staff Analyst subordinated Plaintiff and forced him to report to junior staff, who he had supervised, trained, mentored, in years past.   In addition, Plaintiff suffered the daily humiliation of working on menial and demeaning tasks which are not commensurate with his skills, qualification and experience. To make matters worse, Plaintiff is assigned to work in a cubicle, rather than in an office, where he is now exposed to a constant parade of people who came by to gawk at what has been done to him.

102.    By subjecting Plaintiff to a drastic and unjustified change in the terms of his pay, rank and duties, based on unlawful considerations of his age and disability and in retaliation for his complaints, Defendants caused Plaintiff considerable embarrassment and humiliation, and  subjected Plaintiff to a hostile

work environment.

*Unlawful "Reorganizational" Changes at DOI by PETERS and POGODA*:

103.   Since in or about May 2014, despite Plaintiff's stellar performance as Director, Human Resources and Budget for more than one year, Defendant POGODA, with the active participation of defendant PETERS, set in motion a series of "re-organizational measures" calculated to remove Plaintiff from the Director, Human Resources and Budget position for DOI and replace Plaintiff with younger and non-disabled employees.

104.   These "re-organizational" measures were motivated by considerations of age and disability and in retaliation for Plaintiff's complaints of disability discrimination by Defendants.

105.   Defendants POGODA and PETER's selection of employees who would replace Plaintiff or assume the functions previously handled by Plaintiff was disproportionately and deliberately targeted to select non-disabled employees, and to remove older employees from their senior positions at DOI.

106.   Defendants POGODA and PETER's implementation of the re-organizational measures at DOI was a sham exercise to conceal Defendants' discriminatory objectives, and was carried out without a fair, equitable or proper programmatic and functional analysis.

107.   In or about May 2014, during conversations with Plaintiff regarding

defendant POGODA's decision to hire a replacement for Defendant ULON who had resigned from DOI, and wanted Plaintiff as Director, Human Resources and Budget, to arrange the preparation of a job posting for the position of Assistant Commissioner of Administration, in response to Plaintiff's inquiry as to whether POGODA was looking to hire at the same rate ULON had been paid, about $130,000 per annum, POGODA stated that she was looking to hire at a lower rate and wanted to bring in new ("younger") people.

108.   Also, in or about May 2014, POGODA told an employee in the Human Resources Unit of DOI that she was looking "to bring in younger people at a lower rate of pay who will work to advance in the agency."

109.   As part of their sham re-organizational measures, on or about May 23, 2014, Defendant POGODA, with the active participation of defendant PETERS, hired EDGARDO RIVERA ("RIVERA"), who is in his mid-thirties and has limited work experience, as Assistant Commissioner, Administration, and transferred the human resources and budget responsibilities previously under Plaintiff's purview and supervision to RIVERA.

110.   Similarly, personnel changes instituted shortly after PETERS and POGODA assumed their positions at DOI, was disproportionately and deliberately targeted to select younger employees, and to remove older employees from the senior positions they previously held at DOI.

111.   In furtherance of their sham re-organizational measures, in or about April 2, 2014, defendant PETERS removed VICTOR OLDS, a 62-year old black male as First Deputy Commissioner at DOI, and replaced him in that position, with LESLEY BROVNER, a white female, 45 years of age.

112.   In addition, in or about April 2014, 49-year old  MARIA MOSTAJO was removed from her position as Chief of Staff, and reassigned to another agency.

113.   These changes were implemented as a result of PETERS and POGODA's discriminatory animus towards older and disabled employees.

_Retaliation and discrimination by POGODA, PETERS and other Defendants_:

114.   Since Plaintiff's complaints, starting in May 2014, POGODA, with the active participation of others and to the knowledge of defendant PETERS, have also been unduly critical of Plaintiff by leveling baseless accusations against him, including not changing policies from the previous administration, even though the policies have been in place for over a decade, Plaintiff has been with DOI one and a half years and the previous administration had no interest in making unnecessary changes in its final year.

115.   To date and since Plaintiff's demotion, POGODA and RIVERA have continued to display impatience with and intolerance of Plaintiff's disability and limitations. POGODA and RIVERA have constantly questioned Plaintiff's decisions and work orally and in writing, unjustifiably threatened Plaintiff with

discipline several times, thereby constantly placing him on the defensive end with the feeling that he is being pushed out of DOI.

116. For example, in or about May 2014, when Plaintiff asked a question at a meeting that had already been answered, POGODA shook her head with an overt expression of disgust.

117. Similarly, since PETERS and POGODA assumed their positions at DOI, Plaintiff has often dealt with co-workers rolling their eyes when asked to repeat something said by them to Plaintiff or employees debating or negating the extent of his hearing loss by commenting on how well Plaintiff seems to function and his career accomplishments.

118. Moreover, since June 24, 2014, POGODA by herself and through RIVERA, to the knowledge of PETERS, has repeatedly sent Plaintiff emails requesting policies and procedures, project documents and demanding Plaintiff's immediate response, despite the fact that Plaintiff had been unjustifiably demoted and removed from the position of Director, Human Resources and Budget, and the information defendants were seeking had nothing to do with Plaintiff's present job function as a Human Resources Generalist.

119. These constant demands for information by Defendant POGODA through RIVERA, was in retaliation for Plaintiff's complaint of discrimination and appeal to DCAS and was calculated to harass Plaintiff and take him away from

- 23 -

attending to his present job functions, and are in fact last ditch efforts by Defendants to justify Plaintiff's unlawful demotion and salary reduction, given the determination by DCAS that Plaintiff's salary was cut in violation of the applicable Personnel Service Bulletin and Plaintiff's well-documented record of excellent performance as Director of Human Resources and Budget at DOI.

120.    In a continuing act of discrimination and retaliation against Plaintiff, on or about June 16, 2014, Plaintiff was informed by POGODA and RIVERA that he should vacate his office by June 20. POGODA had chosen a new space for Plaintiff in a heavily congested area by the entrance to the floor, where the noise level is high and many employees congregate.

121.    POGODA and RIVERA, who are well aware of Plaintiff's disability, knew that the additional noise would negatively affect Plaintiff's work and make it difficult for him to speak on the telephone and face to face.

122.    Further, on or about June 18, 2014, Plaintiff was informed by RIVERA that he will now report to Shayvonne Nathaniel, a former subordinate of Plaintiff's who was then the interim Director of Administration and Human Resources.

123.    The actions of Defendants have had an adverse effect on Plaintiff's health. As a result, Plaintiff was hospitalized with cardiac issues and for testing from May 19-21, 2014.

124.   Plaintiff is also suffering from anxiety, trouble sleeping, severe dizzy spells, and compromised balance.

125.   Plaintiff has lost his secondary health insurance, which was provided to him at no cost from the management benefit fund and covered dental, optometry and hearing aids. Plaintiff now has money deducted from his paychecks to cover similar insurance through a different organization.

126.   Plaintiff has been subjected to differential terms and conditions of employment because of his age and disability in December 2012 and since May 2014.

127.   These differential terms and conditions of employment include, but are not limited to:

(a)  failure to recognize Plaintiff's disability and afford him accommodation that had been provided to him at other agencies;

(b)  providing Plaintiff with a misleading and unfair negative performance evaluation;

(c)   retaliation for Plaintiff's appeal of the negative performance evaluation;

(d)  demoting Plaintiff and cutting his salary by almost fifty percent, in violation of City directives;

(e) retaliation for Plaintiff's appeal of his demotion and salary cut;

- 25 -

(f) moving Plaintiff to a new work location that is congested and noisy and will make it difficult for him to perform his work;

(g) incessant harassment not experienced by similarly situated employees, and excessive criticism not otherwise leveled against other employees;

(h) forcing Plaintiff to report to a former subordinate;

(i) failure to assign Plaintiff to positions for which he was suitably and well qualified;

(j) relegating Plaintiff to the functions of an entry level Human Resources Generalist where his career advancement has been hindered, diminished and adversely affected; and

(k) retaliation for Plaintiff's complaints of discrimination.

128.   All the foregoing actions were taken by the defendants in order to deprive Plaintiff of employment and other contractual opportunities because of his age and disability.

*Pattern and Practice of Discrimination and Retaliation by Defendant CITY:*

129.   At all relevant times, the CITY and, particularly, the senior management at DOI, maintain a pattern and practice of unlawful discrimination on the basis of age, disability, sex, race, color, ancestry, national origin, and military status in hiring, retention, promotion, and compensation of employees, and indeed

have been found to have discriminated and retaliated against employees for complaining about discriminatory conduct or for perceived violations of law.

130.   The unlawful treatment of Plaintiff is not an isolated event. Defendant CITY is aware (from lawsuits, notices of claims, and complaints filed against it in this court and elsewhere) that many senior officials, including the defendants, are insufficiently trained in the area of equal employment opportunity, including discrimination on the basis of sex, race, color, ancestry, national origin and military status and retaliating against employees for complaining about discrimination or other unlawful activity.

131.   Defendant CITY is further aware that such improper training has often resulted in deprivation of civil rights, including unlawful discrimination and retaliation. Despite such notice, Defendant CITY has failed to take any or appropriate corrective action. This failure has caused the individual defendants in the present case to violate Plaintiff's civil and human rights.

132.   Moreover, upon information and belief, Defendant CITY was aware, prior to the acts the subject of this lawsuit, that the individual defendants lacked the objectivity, temperament, discretion and disposition to be employed in senior management positions making personnel decisions without regard to sex, race, color, ancestry, national origin, and military status. Despite such notice, Defendant CITY has retained these individuals and failed to adequately train or supervise them.

- 27 -

_Defendants Continuing Violation of Applicable Federal, State and City Laws_:

133.   At all relevant times, the CITY is vicariously liable for the actions of the individual defendants.

134.   All of Defendants' actions against Plaintiff since December 2012 were designed and/or intended by Defendants to impede Plaintiff from asserting his protected rights under the Rehabilitation Act, ERISA and applicable State and City laws.

135.   Defendants' decision not to accommodate Plaintiff's hearing disability and demote him with a nearly fifty percent salary decrease was based on considerations of age and disability and was designed to frustrate Plaintiff, negatively affect his pension benefits and impede his progress and career advancement in the City.

136.   Defendants' actions were unlawful and in violation of Plaintiff's rights under federal laws, such as the Rehabilitation Act and ERISA, and state and local laws, such as the New York City Human Rights Law and New York State Human Rights Law.

137.   Plaintiff complained, to no avail, about the unlawful conduct of the individual defendants towards him.

138.   Because of Plaintiff's protests of violations of his human rights, including the appeal of his negative performance evaluation and appeal to DCAS, Plaintiff was subjected to further discrimination and/or retaliation.

139.   As a proximate result of Defendants' discriminatory and retaliatory conduct towards Plaintiff, Plaintiff suffered significant monetary loss and damages, including the loss of past and future earnings and other employment benefits.

140.   As a further proximate result of Defendants' actions, Plaintiff suffered from heart palpitations, dizziness and fatigue, emotional distress, lasting embarrassment, humiliation and anguish, as well as other incidental and consequential damages and expenses.

*Defendants' Conduct Warrant Imposition of Punitive Damages*:

141.   The conduct of the individual defendants' is outrageous and malicious, was intended to injure Plaintiff and was carried out with reckless indifference to Plaintiff's protected civil rights, thereby entitling him to punitive damages.

*Injunctive Relief is Warranted*:

142.   Plaintiff has no complete, plain, clear or adequate remedy at law.

143.   The acts of the Defendants against Plaintiff continue.  Defendants must be restrained from further retaliation and discrimination against Plaintiff and directed to cease and desist from their unlawful acts against Plaintiff.

144. Plaintiff believes that the Defendants' unlawful acts against him will continue until this Court, by injunction and/or its judgment, compels otherwise.

## AS AND FOR A FIRST COUNT AGAINST DEFENDANT CITY
**(Discrimination Pursuant to the Rehabilitation Act (29 U.S.C. § 701 *et seq.*)**

145. Plaintiff hereby repeats and realleges each allegation in each numbered paragraph above.

146. The Rehabilitation Act, 29 U.S.C. § 701 *et seq.* prohibits discrimination in employment against people with disabilities, including failing to make reasonable accommodations for the known mental and physiological limitations of an otherwise qualified employee.

147. Plaintiff is a disabled individual within the meaning of the Rehabilitation Act, was well-qualified for his position as Director of Human Resources and Budget at DOI, and was demoted as a result of discriminatory animus towards his hearing disability.

148. Defendant CITY receives federal funding and is thus subject to the dictates of the Rehabilitation Act.

149. Defendant CITY discriminated against Plaintiff by failing to accommodate Plaintiff's hearing disability, giving him a negative performance evaluation as a result of this failure, and eventually demoting Plaintiff and cutting his salary by almost fifty percent.

150.  As set forth above, at all relevant times, Defendants and employees of the CITY regarded Plaintiff as a person with a disability that substantially limits Plaintiff's ability to hear and listen.

151.  Similarly, Defendants and other individuals employed the CITY were well aware of Plaintiff's disability through medical and doctors' notes submitted by Plaintiff as well Plaintiff's own records. Accordingly, Defendants relied upon plaintiff's past record of an impairment to discriminate against him.

152.  By reason of the foregoing Plaintiff suffered loss and damage.

## AS AND FOR A SECOND COUNT AGAINST DEFENDANT CITY
### (Retaliation Pursuant to the Rehabilitation Act (29 U.S.C. § 701 *et seq.*)

153.  Plaintiff hereby repeats and realleges each allegation in each numbered paragraph above.

154.  Defendants' aforesaid conduct was in retaliation for Plaintiff's complaints of discrimination on the basis of disability and violated Plaintiff's rights under the Rehabilitation Act.

155.  By reason of the foregoing, Plaintiff has suffered loss and damage in an amount to be determined at trial but estimated to be no less than One Hundred Thousand ($100,000.00) Dollars.

## AS AND FOR A THIRD COUNT AGAINST DEFENDANT CITY
### (Pursuant to ERISA (20 U.S.C. § 1001 *et seq.*)

156.  Plaintiff hereby repeats and realleges each allegation in each

numbered paragraph above.

157.   Defendant CITY's demotion of Plaintiff and decision to cut his salary by almost fifty percent was designed to negatively impact Plaintiff's employee retirement benefits and deprive him of future benefits.

158.   By reason of the foregoing, Plaintiff has suffered loss and damage in an amount to be determined at trial but estimated to be no less than One Hundred Thousand ($100,000.00) Dollars.

### AS AND FOR A FOURTH COUNT
**(Age and Disability Discrimination in Violation of NYCHRL)**

159.   Plaintiff hereby repeats and realleges each allegation in each numbered paragraph above.

160.   By adversely affecting the terms, conditions and privileges of Plaintiff's employment because of his age and disability, Defendants violated New York City Human Rights Law.

161.   By reason of the foregoing, Plaintiff has suffered loss and damage in an amount to be determined at trial but estimated to be no less than One Hundred Thousand ($100,000.00) Dollars.

### AS AND FOR A FIFTH COUNT
**(Age and Disability Discrimination in Violation of NYHRL)**

162.   Plaintiff hereby repeats and realleges each allegation in each numbered paragraph above.

163.   By adversely affecting the terms, conditions and privileges of Plaintiff's employment because of his age and disability, Defendants violated the New York State Human Rights Law.

164.   By reason of the foregoing, Plaintiff has suffered loss and damage in an amount to be determined at trial but estimated to be no less than One Hundred Thousand ($100,000.00) Dollars.

## AS AND FOR A SIXTH COUNT
### (Retaliation in Violation of NYCHRL and NYHRL)

165.   Plaintiff hereby repeats and realleges each allegation in each numbered paragraph above.

166.   All the various actions taken by the defendants against Plaintiff subsequent to when he complained of discrimination constitute unlawful retaliation in violation of New York City and New York State Human Rights Laws.

167.   By reason of the foregoing, Plaintiff has suffered loss and damage in an amount to be determined at trial but estimated to be no less than One Hundred Thousand ($100,000.00) Dollars.

## PUNITIVE DAMAGES

168.   By reason of the wanton, unrepentant and reckless and egregious conduct herein above alleged, Plaintiff claims punitive damages against the individual defendants.

**WHEREFORE,** Plaintiff prays that this Court grant him judgment containing the following relief:

(a) Impanel a jury to hear Plaintiff's claims;

(b) An award of damages in an amount to be determined upon the trial of this matter to compensate Plaintiff for his monetary loss and damages, including Plaintiff's loss of past and future earnings, bonuses, compensation and other employment benefits.

(c) An award of damages to compensate Plaintiff for mental anguish, humiliation, embarrassment and emotional injury for each cause of action;

(d) An award of damages in an amount to be determined upon the trial of this matter to compensate Plaintiff for violations of his rights under the Rehabilitation Act, ERISA, the New York State Human Rights Law, and New York City Human Rights Law;

(e) An award of punitive damages to be determined at the time of trial for each cause of action;

(f) An award of reasonable attorneys' fees and costs related to Plaintiff's clai Rights Law; and

(g) Such other and further relief as this Court may deem just and

proper.

Dated:     New York, New York
           July 22, 2014

                              Respectfully Submitted,

                              SAMUEL O. MADUEGBUNA, ESQ.
                              **MADUEGBUNA COOPER LLP**
                              Attorneys for Plaintiff,
                              RICHARD NATOFSKY
                              30 Wall Street, 8th Floor
                              New York, New York 10005
                              (212) 232-0155

TO:  Defendants

     THE CITY OF NEW YORK
     c/o Corporation Counsel
     Law Department
     100 Church Street
     New York, New York 10007

     SUSAN POGODA
     308 East 79th Street, #3B
     New York, New York 10075

     SHAHEEN ULON
     16 Sylvia Street, #B
     Staten Island, NY 10312

     MARK PETERS
     New York City Department of Investigation
     80 Maiden Lane
     New York, New York 10038

35

*UNITED STATES DISTRICT COURT*
*SOUTHERN DISTRICT OF NEW YORK*                    *Docket No.:*

--------------------------------------------------------------------

*RICHARD NATOFSKY,*

*Plaintiff,*

*-against-*

*THE CITY OF NEW YORK, SUSAN POGODA, SHAHEEN ULON, MARK PETERS, and JOHN and JANE DOE (said names being fictitious, the persons intended being those who aided and abetted the unlawful conduct of the named Defendants),*

*Defendants.*

--------------------------------------------------------------------

## COMPLAINT AND JURY DEMAND

--------------------------------------------------------------------

*Signature (Rule 130-1.1-a)*

_____

*Print name beneath   SAMUEL O. MADUEGBUNA, ESQ.*

--------------------------------------------------------------------

*Yours, etc.*

*MADUEGBUNA COOPER LLP*
*Attorneys for Plaintiff*
*30 Wall Street, 8th Floor*
*New York, New York 10005*
*(212) 232- 0155*

*To: All Counsel of Record*
*Service of the within is hereby admitted on*

_____

*Attorneys for*