**MADUEGBUNA COOPER LLP**
**30 Wall Street, 8th Floor, New York, New York 10005**
**(212) 232 - 0155**

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
RICHARD NATOFSKY,

                Plaintiff,

     - against -

THE CITY OF NEW YORK, SUSAN POGODA,
SHAHEEN ULON, MARK PETERS, and JOHN
and JANE DOE,

               Defendants.
-----------------------------------X

**MEMORANDUM AND ORDER**

14 Civ. 5498 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Plaintiff Richard Natofsky brings this action against defendants City of New York, Susan Pogoda, Shaheen Ulon, Mark Peters, and unidentified John and Jane Does alleging claims of discrimination and retaliation in violation of the Rehabilitation Act, 29 U.S.C. § 701 et seq., the New York Human Rights Law ("NYHRL"), N.Y. Exec. Law § 290 et seq., and the New York City Human Rights Law ("NYCHRL"), New York City Administrative Code § 8-101 et seq. Plaintiff alleges that the defendants, who were his employer and superiors, discriminated against him on the bases of age and disability and retaliated against him for engaging in activity protected by law. The defendants brought a motion for summary judgment on all of plaintiff's claims. For the reasons stated below, the defendants' motion is granted as to the Rehabilitation Act claims. The Court declines to exercise pendent

jurisdiction over the NYHRL and NYCHRL claims and dismisses them without prejudice to their re-filing in state court.

## I.   BACKGROUND

The following facts are taken from the parties' Local Rule 56.1 Statements.  Because we do not address Natofsky's state and city law age discrimination claims in this opinion, the facts pertinent to those allegations are omitted from our recital.

Plaintiff Natofsky has a severe hearing impairment due to nerve damage that he suffered as an infant.  Defs.' 56.1 Stmt. ¶ 2 (ECF No. 45); Pl.'s 56.1 Stmt. ¶ 171 (ECF No. 50).  Although Natofsky wears hearing aids, they do not fully compensate for the hearing loss; Natofsky must also focus intently on a person who is speaking in order to read lips.  Pl.'s 56.1 Stmt. ¶¶ 173, 176.  In addition, Natofsky speaks imperfectly and more slowly than the average person.  Pl.'s 56.1 Stmt. ¶ 175.

From December 2012 until December 2014, Natofsky was employed by the New York City Department of Investigation ("DOI").  Defs.' 56.1 Stmt. ¶ 1.  At the beginning of his tenure at DOI, Natofsky's title was Director of Human Resources and Budget and his salary was $125,000 per year.  Defs.' 56.1 Stmt. ¶ 21.  Natofsky reported to defendant Shaheen Ulon, Deputy Commissioner of Administration.  Defs.' 56.1 Stmt. ¶ 23.  The head of DOI, Commissioner Rose Gill

Hearn, served under then-Mayor Michael Bloomberg.  Defs.' 56.1 Stmt. ¶ 34.

In December 2012, Natofsky first informed Ulon that he had a severe hearing impairment and consequently might have trouble hearing her; that she had to face him when speaking; and that background noise would make hearing more difficult for him.  Pl.'s 56.1 Stmt. ¶ 26.

The first three months of Natofsky's employment appear to have passed without much incident.  However, sometime in or about March 2013, Ulon asked Natofsky to "follow up on e-mails more quickly" because Natofsky "didn't respond as quickly as the issues needed to be addressed."  Defs.' 56.1 Stmt. ¶ 28.  In response, on March 25, 2013, Natofsky wrote an email to Ulon titled "Follow-up: March 22 Discussion," which said in part:

> I would also like to give you a better understanding of my hearing loss.  I have a severe hearing loss that equates to an 85% loss of hearing in both ears.  I am dependant [sic] on my hearing aids to hear, but my hearing with the hearing aids it [sic] is not the same as that of a person with normal hearing.  Hearing does not come naturally to me even with the usage of hearing aids.  Hearing is something I have to focus on and actually "do", contrary to others with normal hearing. Therefore, I am not able to listen and do something else, such as writing or reading emails.  When I am listening to someone speak, I need to concentrate and at times I read a person's lips.  Even so, there will be occasions that I miss something or may hear something incorrectly. I put an extraordinary effort into listening and cannot multi task while I am doing that.
>
> As for responding to Executive Staff emails immediately, I believe that all my emails are responded to in a timely

manner. They are answered as soon as I am able to and
unless there are extenuating circumstances, the emails
are answered before the end of a day. I realize that
everyone believes his or her issue is the priority. I
suggest that if someone has an extremely urgent or time
sensitive issue, he or she contact [secretary] Phyllis
so that she can alert me. If some of the emails I send
to others were answered in a timelier manner, it would
make my job easier. Sometimes I have to wait for days
for a response and need to send follow up emails. I am
often waiting for information necessary for me to
complete something and this slows down the processing of
work assignments.

Leighton Decl. Ex. D (ECF No. 43). After this email, Ulon and
Natofsky had no further discussion of the topic. Pl.'s 56.1 Stmt.
¶ 28(c).

In June 2013, Ulon made two additional requests of Natofsky.
First, she asked Natofsky to arrive at work between 9:00 a.m. and
10:00 a.m., rather than between 8:00 a.m. and 8:30 a.m. as was his
practice. Defs.' 56.1 Stmt. ¶ 29. Second, after Natofsky
requested specific dates in the summer to take his annual leave,
Ulon asked Natofsky to "submit leave requests that are longer in
length, but occur less frequently." Defs.' 56.1 Stmt. ¶ 32. Upset
by these requests, Natofsky contacted Commissioner Gill Hearn.
Pl.'s 56.1 Stmt. ¶ 31(e); Defs.' 56.1 Stmt. ¶ 34. Natofsky
explained to Gill Hearn that his early arrival to work allowed him
to catch up on emails that he could not respond to while in
meetings, and that Ulon did not understand his "special needs in
terms of hearing." Pl.'s 56.1 Stmt. ¶ 34. Gill Hearn then met
with Ulon to discuss the requests. Defs.' 56.1 Stmt. ¶¶ 35, 38.

The parties dispute whether Gill Hearn and Ulon discussed
Natofsky's disability at this meeting.  Defs.' 56.1 Stmt. ¶ 36;
Pl.'s 56.1 Stmt. ¶ 36.  Defendants do assert that Gill Hearn and
Ulon discussed Ulon's concerns with Natofsky's work performance,
and plaintiff neither disputes this assertion nor offers evidence
to the contrary.  Defs.' 56.1 Stmt. ¶ 37; Pl.'s 56.1 Stmt. ¶ 37.
In any event, it is undisputed that after the meeting between Gill
Hearn and Ulon, Ulon permitted Natofsky to continue arriving to
work at his usual time and to take his leave as requested.  Defs.'
56.1 Stmt. ¶ 38; Pl.'s 56.1 Stmt. ¶ 38.

In November 2013, Bill de Blasio was elected as the new mayor
of New York City.[1]

In December 2013, Natofsky received two awards at a
departmental ceremony.  Pl.'s 56.1 Stmt. ¶ 46.  The first award,
which was given to three people that year at DOI, was for going
above and beyond in the recipient's job performance.  Pl.'s 56.1
Stmt. ¶ 46(b).  Gill Hearn gave Natofsky this award.  Defs.' 56.1
Stmt. ¶ 160.  The second award, which was given to most of DOI's
200 employees, was for a good record of performance.  Pl.'s 56.1
Stmt. ¶ 46(c).  On December 31, 2013, Gill Hearn wrote a memorandum

---

[1] Michael Barbaro & David W. Chen, De Blasio Is Elected New York City Mayor in
Landslide, N.Y. Times, Nov. 5, 2013, http://www.nytimes.com/2013/11/06/
nyregion/de-blasio-is-elected-new-york-city-mayor.html; see Fed. R. Evid.
201(b) ("The court may judicially notice a fact that is not subject to reasonable
dispute"); Fed. R. Evid. 201(c)(1) ("The court may take judicial notice on its
own").

Case 1:14-cv-05498-NRB  Document 68  Filed 08/08/17  Page 6 of 45

to Natofsky titled "Salary Increase," which said, "It is with pleasure that I inform you that effective Monday, January 6, 2014 that you have been given a salary increase of $4,000 in recognition of your fine performance of tasks related to Budget and Human Resources.  Your new base salary will be $129,000 per annum.  I greatly appreciate your commitment and dedication to DOI." Leighton Decl. Ex. W at EMAIL002040.

At the end of 2013, with the mayoral transition from Michael Bloomberg to Bill de Blasio, Gill Hearn left her job as DOI's Commissioner.  Defs.' 56.1 Stmt. ¶ 47.  Effective January 1, 2014, Victor Olds became DOI's "Interim or Acting Commissioner." Defs.' 56.1 Stmt. ¶ 48.  In late February 2014, Olds was replaced by the new Commissioner of DOI, defendant Mark Peters.  Defs.' 56.1 Stmt. ¶ 49.  Peters appointed defendant Susan Pogoda as DOI's Chief of Staff and Deputy Commissioner for Agency Operations.  Defs.' 56.1 Stmt. ¶ 52.  During this time, Natofsky retained his title as Director of Human Resources and Budget and continued to report to Ulon.

Upon their arrival at DOI, Peters tasked Pogoda with assessing whether certain units within DOI should be reorganized.  Defs.' 56.1 Stmt. ¶¶ 62, 64.  While the timeline is not clear, around this time Pogoda met with Ulon to discuss all of Ulon's direct

reports, including Natofsky.  Defs.' 56.1 Stmt. ¶ 68.[2]  According
to Ulon's uncontroverted testimony, Pogoda "expressed some concern
and said that she would be moving various people around and making
some structural changes."  Defs.' 56.1 Stmt. ¶ 70.  As to
Natofsky's combined position of Director of Human Resources and
Budget, Peters and Pogoda developed the view that it would be more
appropriate for the departmental areas to be split and headed by
separate individuals because of the need for "checks and balances.
Budget handles the money, HR handles the hiring of people." Defs.'
56.1 Stmt. ¶¶ 77-78.

On February 21, 2014, Pogoda met Natofsky for the first time
during which, according to Natofsky, Pogoda kept staring at his
ears and carefully observing him when he spoke.  Pl.'s 56.1 Stmt.
¶ 68(a), 179.  The next day, a Saturday, Pogoda sent Ulon an email
titled "Richard Natofsky" and asked for his resume along with the
resume of the new Director of Fiscal Services.  Pl.'s 56.1 Stmt.
¶ 68(b).  Natofsky alleges that on or about March 6, 2014, he told
Pogoda of his hearing disability and that in response Pogoda "shook
her head in disgust and rolled her eyes."  Pl.'s 56.1 Stmt. ¶¶
185-86, 200.  Natofsky further alleges that throughout March and
April, Pogoda told Natofsky that he needed to speak more quickly

---

[2] Plaintiff disputes this fact but does not provide any relevant contradictory
evidence.  See Pl.'s 56.1 Stmt. ¶ 68.

and clearly, and that she was impatient with him when he was speaking. Pl.'s 56.1 Stmt. ¶ 203.

Sometime in March 2014, Commissioner Peters had at least one meeting with Pogoda, Ulon, and Natofsky in which Peters requested information on the number of additional people he could hire based on the current budget. Defs.' 56.1 Stmt. ¶¶ 67, 72; Pl.'s 56.1 Stmt. ¶¶ 67, 72. After Ulon and Natofsky were unable to provide the requested information during the meeting (or meetings), Peters expressed his frustration with them to Pogoda. Defs.' 56.1 Stmt. ¶ 72. Natofsky asserts that he was eventually able to provide Peters with the requested information. Pl.'s 56.1 Stmt. ¶ 74. On March 5, 2014, Pogoda wrote in an email to a DOI Associate Commissioner, regarding an unrelated issue, that "Shaheen [Ulon] and Richard [Natofsky] are clueless." Defs.' 56.1 Stmt. ¶ 73.

On March 10, 2014, Ulon wrote to Natofsky a memorandum regarding some performance deficiencies (the "Counseling Memorandum"). She wrote: "As a follow-up to our conversation today and on previous occasions, please be sure to carefully review and edit the work of your staff on routine HR assignments, including the new employee welcome letters and job postings. There have been numerous, repeated grammatical/typographical and other errors on this type of correspondence. As HR Director, you must take the responsibility for the work of your staff. Taking responsibility for the work of your staff entails performing a

careful review of the documents before they are distributed to other DOI staff for review."  Defs.' 56.1 Stmt. ¶ 71.

On March 27, 2014, Pogoda expressed to Ulon her concern that there existed few written policies and procedures and that the forms that were typically used in the department were outdated, incorrect, and confusing.  Defs.' 56.1 Stmt. ¶ 75.

On April 2, 2014, Pogoda allegedly told Natofsky that he had nothing to worry about at DOI, that he would be able to "spread his wings" once Ulon was gone, that Ulon's performance evaluations were "flaky," that Ulon needed to take responsibility for her own actions, and that Natofsky would keep his position and salary. Pl.'s 56.1 Stmt. ¶¶ 212-13.  Pogoda denies making these statements. Pl.'s 56.1 Stmt. ¶¶ 214-15, 217-19.

In April 2014, Pogoda met with Ulon and told Ulon that the "commissioner only wanted two deputies at that point, a first deputy and a deputy commissioner for agency operations.  Since Ms. Ulon was a deputy commissioner, that role now in the reorganization would not be available, however, there was a role in the newly created NYPD IG [New York Police Department Inspector General] that needed a director to liaison with DOI."  Defs.' 56.1 Stmt. ¶ 81.  Rather than accept the other position, Ulon resigned from DOI effective May 1, 2014.  Defs.' 56.1 Stmt. ¶¶ 79, 84.

On May 1, 2014 -- Ulon's last day -- Ulon provided Natofsky with a formal written evaluation of his work from January 1, 2013

9

to December 31, 2013 (the "Performance Evaluation").  Defs.' 56.1

Stmt. ¶ 39.  Ulon rated Natofsky's 2013 overall performance a two

out of five (qualitatively called "Needs Improvement").  Defs.'

56.1 Stmt. ¶ 42; Leighton Decl. Ex. H.  Of the 14 categories of

evaluation, Ulon rated Natofsky three out of five ("Fully Meets

Requirements") in seven categories and two out of five ("Needs

Improvement") in seven categories.[3]  Id.  For each of the seven

categories rated "Needs Improvement," Ulon wrote a short

explanation.  See Leighton Decl. Ex. H.  Under the category "Other

Managerial Accountabilities," Ulon wrote:

> HR and Budget tasks have not been completed in a timely
> manner, which has prompted regular follow-up from the
> inquiring individual or entity - Deputy Commission for
> Administration, DOI staff, OMB, DCAS, etc.
>
> Email responsiveness needs improvement.  This has been
> pointed out by myself and other members of the Executive
> Staff that haven't receive [sic] timely responses to
> emails.
>
> Deference to supervisor and ability to take direction -
> Richard has questioned my direction on a number of
> occasions, and this has been pointed out by other
> Executive Staff members.

Id. at 4.

On May 8, 2014, Natofsky appealed his performance evaluation

to Pogoda.  Leighton Decl. Ex. V.  Natofsky opened the Evaluation

Appeal with the following arguments:

---

[3] Two other categories were considered "Not Applicable" to Natofsky.  Leighton
Decl. Ex. H.

> I strongly feel that the performance evaluation prepared
> by Shaheen Ulon depicts an inaccurate and unfair
> assessment of my work performance. I am supporting this
> statement by providing information and correspondence
> herein this [sic] memorandum and attached.
>
> The performance evaluation is based on a job description
> that was never given to me. It along with my evaluation
> was presented to me by Shaheen Ulon during her last hour
> of employment with the Department of Investigation (DOI)
> on May 1, 2014. As per Citywide protocol, this
> information should be presented to all employees during
> the first month or so of their employ with the Department
> of Investigation (DOI) and/or at the beginning of the
> evaluation period. Furthermore, the tasks and
> expectations must be agreed upon between a supervisor
> and subordinate before proceeding further. Shaheen Ulon
> was fully aware of this requirement as I discussed it
> with her numerous times. The only job description in my
> possession relates to the Human Resources/Director
> position (job posting) of which I applied for [sic].
> Lastly, the performance evaluation lacks substantiation
> pertaining to the criticisms. The departure of Shaheen
> Ulon has hindered and violated my ability and legal right
> to have a meaningful appeal. . . .

Id. Natofsky then launched into a list of his accomplishments and

a line-by-line rebuttal of the Performance Evaluation. On the

third page of the rebuttal, in response to the comment in the

Performance Evaluation that "Email responsiveness needs

improvement," Natofsky wrote:

> The only person who pointed out needed [sic] improvement
> with my e-mail response was Shaheen Ulon. One attached
> email correspondence denotes that I have a severe
> hearing loss which hinders my ability to immediately
> respond to emails during meetings and face to face
> discussions. Furthermore, many of Shaheen Ulon's e-
> mails were redundant thereby asking for responses which
> were previously provided.

Id.

Sometime in the spring of 2014, and after discussion with Pogoda, Peters made the decision to reassign Natofsky from his position.  Peters testified, "The decision was ultimately mine. . . . Susan [Pogoda] certainly discussed it with me before the decision was made and I approved it and so it was certainly my decision."  Defs.' 56.1 Stmt. ¶ 109.  Natofsky admits that the decision was Peters's.  Pl.'s 56.1 Stmt. ¶ 109.  By letter dated May 20, 2014, Pogoda wrote to Natofsky:

> The Human Resources and Budget Units are being reorganized.  As such, effective today, May 20, 2014 you will serve in your competitive civil service title of Associate Staff Analyst at a salary of $68,466 per annum in the Human Resources Unit of the Administrative Division.  Your office title will be Human Resources Generalist.

Leighton Decl. Ex. S.  The parties dispute how to characterize this event:  plaintiff calls it a "demotion," while the defendants call it a "reassignment."  As plaintiff is the non-movant, we will use the term "demotion" for purposes of this opinion.

On May 28, 2014, Natofsky wrote in an email to Peters and Pogoda:

> I totally disagree with the rationale for the decision to demote me, change my title and drastically reduce my salary.  By all accounts it is illegitimate and contrary to law. . . .  Without accepting this unjustified change in my employment status, and bearing in mind the strategic role the Director, Human Resources and Budget play [sic] within our agency, I am asking that you clarify and provide guidance to me regarding my interim functions.

12

Leighton Decl. Ex. T.  In a response email Pogoda wrote, "As per the May 20, 2014 letter and our discussion on May 23rd, 2014 you were returned to your competitive civil service title of Associate Staff Analyst due to an ongoing reorganization of the Human Resources and Budget Units."  Id.  The new Assistant Commissioner of Administration, Edgardo Rivera, temporarily assumed Natofsky's former budget functions, and the new Director of Administration for the Office of the Inspector General for the New York Police Department, Shayvonne Nathaniel, temporarily assumed Natofsky's former human resources functions.  Defs.' 56.1 Stmt. ¶¶ 85, 117, 120, 121.  DOI eventually hired a new Director of Budget and Director of Human Resources.  Defs.' 56.1 Stmt. ¶¶ 120, 122.

On June 6, 2014, Pogoda informed Natofsky that he would be moved from his private office to a cubicle.  Maduegbuna Decl. Ex. 37 (ECF No. 49).  On June 16, 2014, Natofsky replied that he needed assistance in moving his items because he was "currently under a doctor's care" and had "physical restrictions which include lifting and carrying."  Id.  The parties do not offer evidence showing whether Natofsky received the assistance.  Natofsky was moved to a cubicle on or about June 20, 2014.  Id.  The cubicle was in a high-traffic, high-volume area, and the cubicle had been previously used by his former secretary.  Pl.'s 56.1 Stmt. ¶¶ 259-60.  When Natofsky advised Rivera of the noise and congestion of

the cubicle, Natofsky was moved to a different cubicle location. Defs.' 56.1 Stmt. ¶ 146.

On June 17, 2014, Natofsky complained to Rivera that he suddenly began receiving paper checks instead of direct deposit. Pl.'s 56.1 Stmt. ¶ 272.

On June 18, 2014, Natofsky appealed his "demotion and reduction of salary" to the New York City Department of Citywide Administrative Services ("DCAS"). Leighton Decl. Ex. W. In that appeal he wrote:

> I write to appeal my demotion and reduction of my salary . . . in violation of the New York City Personnel Services Bulletin, Article 3, Section 320-R (Mayor's Personnel Order No. 78/9), relating to demotion of managers (attached). . . .
>
> I was given no justifiable reason as to why my salary was so drastically cut and I was demoted. There was no justifiable reason for these actions . . . . The available evidence strongly indicates that I was so singled out and treated based on a number of unlawful considerations.
>
> By all accounts the decision to single me out and treat me in this manner is illegitimate and contrary to law. I have made this known to Susan Pogoda and DOI Commissioner Peters and have stated in writing that I totally disagree with the rationale for the decision to demote me, change my title and drastically reduce my salary as it is unlawful. Despite my protest, they have refused to change their minds and have maintained their unlawful position. . . .
>
> When you look into this matter, you will find that the procedure that was put in place by DCAS and the City of New York to deal with just this type of situation was not followed by Susan Pogoda, Commissioner Peters and other DOI officials.

> I am therefore respectfully requesting that the almost
> 50% pay cut and my demotion be rescinded retroactively
> based upon DOI's failure to follow the required
> procedure in the Personnel Services Bulletin (copy
> attached) and I be reinstated to my previous managerial
> position.

Leighton Decl. Ex. W. Natofsky did not send a copy of the appeal to DOI. Defs.' 56.1 Stmt. ¶ 129; Pl.'s 56.1 Stmt. ¶ 129.

On June 23, 2014, DCAS wrote to Rivera, copying Pogoda and others, "In general, managers should not lose more than 20% of their salary when they are reassigned to a lower managerial level or to their permanent leave line. However, in Mr. Natofsky's case, a 20% reduction from $129,000 would result in a salary above the maximum for Associate Staff Analyst, his permanent title. Therefore, the salary reduction % needs to be increased so that he is paid no more than the maximum, which is $88,649. Please correct his salary from $68,466 to $88,649." Leighton Decl. Ex. X. DCAS informed Natofsky on June 27, 2014 that his salary would be adjusted accordingly. Defs.' 56.1 Stmt. ¶ 132. Although a salary adjustment typically takes 24 hours to process, Pl.'s 56.1 Stmt. ¶ 266, one month passed before Natofsky's salary was adjusted in the system, Defs.' 56.1 Stmt. ¶ 137.

On June 29 and 30, 2014, Pogoda questioned Natofsky regarding an incident in which an employee's personnel file went missing and was found in an unlocked drawer in Natofsky's work area. Defs.' 56.1 Stmt. ¶ 147; Leighton Decl. Ex. DD.

On July 22, 2014, Natofsky filed the instant lawsuit.  On the same day, Pogoda and Rivera instructed Natofsky to include the title of "Human Resources Generalist" in his email signature. Pl.'s 56.1 Stmt. ¶ 274.  On July 23, 2014, Natofsky's salary was adjusted in the system, on which date Natofsky also received a lump sum payment of back pay.  Defs.' 56.1 Stmt. ¶¶ 137-38.

On September 11, 2014, Pogoda denied Natofsky's appeal of Ulon's May 1, 2014 Performance Evaluation.  Pl.'s 56.1 Stmt. ¶ 281.

On September 2, 2014, Natofsky informed Nathaniel and another employee that, according to his union, he was entitled to longevity pay of $5,414.  Pl.'s 56.1 Stmt. ¶ 282.  Receiving no response, he had to follow up on this request on October 1, 2014, and November 7, 2014.  Pl.'s 56.1 Stmt. ¶¶ 283-85.

Natofsky left DOI in December 2014.  Defs.' 56.1 Stmt. ¶ 168. He returned to the agency at which he was formerly employed, the New York City Department of Transportation, as an Operations and Budget Administrator with a salary of $100,437.  Id.

On December 10, 2015, Natofsky emailed an employee at DOI stating that, according to his union, he was entitled to retroactive pay for some of his time at DOI.  Pl.'s 56.1 Stmt. ¶ 293.  Rivera denied the retroactive pay on January 8, 2016.  Pl.'s 56.1 Stmt. ¶ 295.  After a representative of Natofsky's union

explained to DOI why the request should have been granted, Rivera provided the retroactive pay.  Pl.'s 56.1 Stmt. ¶¶ 298-99.

Natofsky asserts the following claims: (1) a Rehabilitation Act claim against the City for disability discrimination; (2) a Rehabilitation Act claim against the City for retaliation; (3) a NYHRL claim against all defendants for disability discrimination; (4) a NYCHRL claim against all defendants for disability discrimination; (5) a NYHRL claim against all defendants for age discrimination; (6) a NYCHRL claim against all defendants for age discrimination; (7) a NYHRL claim against all defendants for retaliation; and (8) a NYCHRL claim against all defendants for retaliation.[4]

## II.  DISCUSSION

### A.  Standard for Summary Judgment

Summary judgment is granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). "A fact is material when it might affect the outcome of the suit under governing law," and "[a]n issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  McCarthy v. Dun & Bradstreet Corp., 482

---

[4] Plaintiff dismissed with prejudice a claim against the City brought under the Employee Retirement Income Security Act of 1974, 20 U.S.C. §§ 1001, et seq.

F.3d 184, 202 (2d Cir. 2007) (internal quotation marks and citations omitted). "In assessing the record to determine whether there is a genuine issue to be tried, we are required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 101 (2d Cir. 2010). Furthermore, "[t]he moving party bears the initial burden of demonstrating 'the absence of a genuine issue of material fact.'" F.D.I.C. v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010)(quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).

Although "a workplace discrimination case . . . usually require[s] an exploration into an employer's true motivation and intent for making a particular employment decision," McMunn v. Mem'l Sloan-Kettering Cancer Ctr., No. 97 Civ. 5857 (NRB), 2000 WL 1341398, at *2 (S.D.N.Y. Sept. 15, 2000), "summary judgment may be proper even in workplace discrimination cases . . . because 'the salutary purposes of summary judgment -- avoiding protracted, expensive and harassing trials -- apply no less to discrimination cases than to other areas of litigation,'" Campbell v. Cellco P'ship, 860 F. Supp. 2d 284, 294 (S.D.N.Y. 2012) (quoting Hongyan Lu v. Chase Inv. Servs. Corp., 412 F. App'x 413, 415 (2d Cir. 2011)). A plaintiff must produce evidence that rises above the level of conclusory allegations to defeat a motion for summary

judgment, and it is the court's responsibility to "distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture." Bickerstaff v. Vassar Coll., 196 F.3d 435, 448 (2d Cir. 1999).

## B. Disability Discrimination Claims under the Rehabilitation Act

The Rehabilitation Act states:  "No otherwise qualified individual . . . shall, *solely* by reason of her or his disability, be . . . subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a) (emphasis added).  This statutory language differentiates the Rehabilitation Act from other discrimination-related federal statutes in that it requires "proof that discrimination was *solely* due to an individual's disability . . . ." Itzhaki v. Port Auth. of N.Y. & N.J., No. 15 Civ. 7093 (JMF), 2017 WL 213808, at *3 (S.D.N.Y. Jan. 17, 2017) (internal quotation marks omitted).  We also note that plaintiff asserts Rehabilitation Act claims only against the City, as "claims under the Rehabilitation Act may not be brought against individuals, either in their personal or official capacity . . . ." Harris v. Mills, 478 F. Supp. 2d 544, 547-48 (S.D.N.Y. 2007), aff'd, 572 F.3d 66 (2d Cir. 2009).

A plaintiff may defeat a defendant's motion for summary judgment in two ways.  Either he may present "direct evidence of discrimination -- a 'smoking gun' attesting to a discriminatory

intent," or he may proceed under the *McDonnell Douglas* burden-shifting framework. Holtz v. Rockefeller & Co., 258 F.3d 62, 76 (2d Cir. 2001) (internal quotation marks omitted and alteration incorporated). Here, plaintiff proceeds under the latter. Under either approach, however, the "ultimate issue" is whether the plaintiff has met his burden of proving that the adverse employment decision was motivated by "an 'impermissible reason,' i.e., that there was discriminatory intent." Weisbecker v. Sayville Union Free Sch. Dist., 890 F. Supp. 2d 215, 231-32 (E.D.N.Y. 2012); see also Fields v. N.Y. State Office of Mental Retardation & Developmental Disabilities, 115 F.3d 116, 119 (2d Cir. 1997).

Under the *McDonnell Douglas* framework, "[a] plaintiff must establish a *prima facie* case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the [adverse employment action]; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." McBride v. BIC Consumer Prod. Mfg. Co., 583 F.3d 92, 96 (2d Cir. 2009) (internal quotation marks omitted).

Plaintiff alleges two theories of disability discrimination. First, plaintiff alleges that he experienced disparate treatment due to his disability. Second, plaintiff alleges that DOI failed to accommodate his disability. We address each of these theories in turn.

20

### 1.  Disparate Treatment Claims

To make out a *prima facie* case, a plaintiff must show by a preponderance of the evidence that "(1) plaintiff's employer is subject to the Rehabilitation Act; (2) plaintiff was disabled within the meaning of the Rehabilitation Act; (3) plaintiff was otherwise qualified to perform the essential functions of [his] job, with or without reasonable accommodation; and (4) plaintiff suffered an adverse employment action because of [his] disability." Quadir v. N.Y. State Dep't of Labor, No. 13 Civ. 3327 (JPO), 2016 WL 3633406, at *5 (S.D.N.Y. June 29, 2016) (internal quotation marks omitted and alterations incorporated), aff'd, No. 16-2617, 2017 WL 2399584 (2d Cir. June 2, 2017). "The requirements to establish a *prima facie* case are minimal, and a plaintiff's burden is therefore not onerous." Bucalo v. Shelter Island Union Free Sch. Dist., 691 F.3d 119, 128 (2d Cir. 2012) (internal quotation marks and citations omitted).

At the second stage in the *McDonnell Douglas* framework, the defendants bear the "burden of producing evidence that the adverse employment actions were taken for a legitimate, nondiscriminatory reason." Id. at 128-29 (internal quotation marks omitted). "This burden is one of production, not persuasion." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000). "If the defendant satisfies its burden of production, then the presumption raised by the *prima facie* case is rebutted and drops from the case." Bucalo,

691 F.3d at 120 (internal quotation marks omitted). Once the presumption is rebutted, the "sole remaining issue [is] discrimination *vel non*." Reeves, 530 U.S. at 143.

At the final stage, "the plaintiff must . . . come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination. The plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action." Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000) (internal quotation marks and citations omitted). "The plaintiff retains the burden of persuasion." Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981).

According to Natofsky, he experienced the following adverse employment actions: his requested vacation dates were initially denied; he was asked to arrive to work at a later time than he preferred; he received a negative performance evaluation; he was demoted; and he experienced a salary cut.

### a.   Vacation Requests and Work Hours

"An adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities. Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary,

22

a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003) (internal quotation marks and citation omitted); see also Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 89 (2d Cir. 2015).

Natofsky plainly did not suffer adverse employment actions when Ulon initially denied his vacation requests or when she asked him to arrive at work at her preferred time. After a discussion with Gill Hearn, Ulon ultimately granted Natofsky's vacation requests and permitted him to continue arriving to work at his preferred time. See Defs.' 56.1 Stmt. ¶ 38 ("Following her discussion with then-Commissioner Gill Hearn, Ms. Ulon granted plaintiff's leave request and, as well, permitted him to continue to arrive at work at 8:00 a.m."); Pl.'s 56.1 Stmt. ¶ 38 ("Admitted."). Natofsky makes no allegation that in the interim he missed an opportunity to take his vacation as requested or that he arrived at work at Ulon's preferred time. Therefore, he did not experience any "adverse change in the terms and conditions of employment," Bowen-Hooks v. City of N.Y., 13 F. Supp. 3d 179, 211 (E.D.N.Y. 2014), material or otherwise, and he has failed to make a *prima facie* case as to these actions.[5]

---

[5] Even if he were forced to change his vacation or work schedule, a "denial of vacation time and alteration of Plaintiff's [] schedule . . . do not rise to

23

### b. Performance Evaluation

Natofsky next alleges a claim based upon his negative Performance Action. "[N]egative evaluations alone, without any accompanying adverse consequences, such as a demotion, diminution of wages, or other tangible loss, do not constitute adverse employment actions." Walder v. White Plains Bd. of Educ., 738 F. Supp. 2d 483, 499 (S.D.N.Y. 2010). Defendants argue that the Performance Evaluation is not an adverse employment action because it did not affect Peters's demotion decision. Defs.' Mem. of Law at 11 (ECF No. 44). Natofsky's only response is to argue that the Performance Evaluation "could have influenced" the demotion decision because the final decision to demote Natofsky was made "sometime in April" 2014, and Ulon sent to Pogoda a draft of the Performance Evaluation on April 25, 2014. Pl.'s Opp'n at 5 (ECF No. 52); see Maduegbuna Decl. Ex. 16. Importantly, Natofsky never alleges that Peters saw the Performance Evaluation. Natofsky further never suggests why Peters would have been influenced by an evaluation written by Ulon, who herself was let go during the reorganization. It is difficult to say under these circumstances that the Performance Evaluation was "accompanied by" a demotion. Without deciding this issue, we will proceed to evaluate Natofsky's *prima facie* case regarding the Performance Evaluation.

---

the level of an adverse employment action." Kaur v. N.Y. City Health & Hosps. Corp., 688 F. Supp. 2d 317, 332 (S.D.N.Y. 2010).

Natofsky's *prima facie* case is as follows.  In March 2013, Ulon criticized Natofsky for his response time on emails.  The day after that discussion, Natofsky wrote to Ulon that because of his disability, he could not multitask on email during meetings. Natofsky proposed that in lieu of multitasking, his secretary could inform him of anything urgent that arose during meetings; there is no evidence that this proposal was agreed to or acted upon.  Over a year later, Natofsky received a negative performance review at least in part because his "[e]mail responsiveness needs improvement."  Other than an inference drawn from the words "email responsiveness," there is no evidence that Ulon was referring to the narrow email-responsiveness-in-meetings issue which relates to Natofsky's hearing disability, rather than a broader issue relating to the general timeliness of Natofsky's emails.[6]  There is furthermore no other evidence from which to draw an inference that the Performance Evaluation was negative *solely* because of Natofsky's disability.  If Natofsky has made out a *prima facie* case on the Performance Evaluation, he has done so just barely.

---

[6] We observe that Natofsky's March 25, 2013 email itself could be read to draw a distinction between a narrow email-responsiveness-in-meetings issue and a broader email responsiveness issue.  <u>Compare</u> Leighton Decl. Ex. D ("I suggest that if someone has an extremely urgent or time sensitive issue, he or she contact Phyllis so that she can alert me."), <u>with</u> <u>id.</u> ("As for responding to Executive Staff emails immediately, I believe that all my emails are responded to in a timely manner.  They are answered as soon as I am able to and unless there are extenuating circumstances, the emails are answered before the end of a day.").  The statement "the emails are answered before the end of a day" furthermore could be read as an acknowledgment that it would be fair to criticize Natofsky if he failed to answer emails within a day.

Assuming, without deciding, that Natofsky has made a *prima facie* case, the defendants have met their burden of production at the second stage. "The court is not to pass judgment on the soundness or credibility of the reasons offered by defendants, so long as the reasons given are 'clear and specific.'" Schwartz v. York Coll., 06 Civ. 6754 (RRM)(LB), 2011 WL 3667740 (E.D.N.Y. Aug. 22, 2011) (quoting Mandell v. Cnty. of Suffolk, 316 F.3d 368, 381 (2d Cir. 2003)). Defendants produce documentary and testimonial evidence that Natofsky was in fact a poor performer, Defs.' 56.1 Stmt. ¶¶ 37, 45, 71, 102-04, 106, 107, which is a sufficient non-discriminatory reason for the negative Performance Evaluation. See Auguste v. N.Y. Presbyterian Med. Ctr., 593 F. Supp. 2d 659, 666 (S.D.N.Y. 2009) ("[P]oor work performance has often been recognized as a legitimate, non-discriminatory reason" for an employment action).

At the final stage, Natofsky offers a multitude of assertions regarding pretext. However, he has failed to provide sufficient evidence from which a reasonable jury could find that "poor work performance" is, more likely than not, a pretext for an adverse action that was taken solely due to discrimination.

Natofsky exerts a great deal of effort re-litigating the Performance Evaluation. First, he offers arguments as to why the

defendants should not have considered his performance poor.[7]
Natofsky fails to appreciate that regardless of the actual quality
of his performance, "[t]he mere fact that plaintiff may disagree
with his employer's actions or think that his behavior was
justified does not raise an inference of pretext." Melman v.
Montefiore Med. Ctr., 98 A.D.3d 107, 121, 946 N.Y.S.2d 27 (1st
Dep't 2012) (internal quotation marks omitted and alterations
incorporated). In other words, "[i]t matters not whether the
employer's stated reason for the challenged action was a good
reason, a bad reason, or a petty one. What matters is that the
employer's stated reason for the action was nondiscriminatory."
Id. (internal quotation marks omitted and alterations
incorporated).

Second, Natofsky asserts that Ulon "violated DOI policy by
not giving Natofsky Tasks & Standards, despite his requests, and
then improperly evaluating Natofsky based on Tasks & Standards he
had never seen or agreed to." Pl.'s Opp'n at 8. However, doing
so does not support an inference that he was discriminated against
solely because of his disability. "[A]n employer's alleged failure

---

[7] See, e.g., Pl.'s Opp'n at 7 ("Ulon's claim [in the evaluation] that Natofsky
was 'untimely' when performing budget and human resource functions is undermined
by her email admission to Pogoda that Natofsky's units were understaffed."));
id. at 19 (in response to the testimony of a co-worker, Shameka Boyer, that she
"did not believe that Mr. Natofsky understood or valued my time because he would
ask the same question of several members of my team," Defs.' 56.1 Stmt. ¶ 103,
Natofsky argues, "Boyer exaggerated the number of calls and claimed they were
unprofessional but had no idea what the calls were about.").

to follow termination procedures d[oes] not support a discrimination claim in the absence of evidence showing that the procedure was applied differently to protected and non-protected employees." Forte v. Liquidnet Holdings, Inc., No. 14 Civ. 2185 (AT), 2015 WL 5820976, at *10 (S.D.N.Y. Sept. 30, 2015) (citing Stanojev v. Ebasco Servs., Inc., 643 F.2d 914, 923 (2d Cir. 1981)), aff'd, No. 15-3465-CV, 2017 WL 104316 (2d Cir. Jan. 10, 2017). Relatedly, Natofsky's assertion that Ulon failed to raise the email responsiveness issue between March 2013 and May 2014 or "raise her other criticisms with Natofsky before issuing his evaluation," Pl.'s Opp'n at 7, do not demonstrate pretext. See Forte, 2015 WL 5820976, at *10 ("[E]ven assuming Defendants failed to provide progressive discipline, Plaintiff has not shown that such failure demonstrates pretext with respect to Defendants' motivation for discharging Plaintiff."). We further note that the record shows that Ulon did raise criticisms with Natofsky before the May 2014 evaluation -- e.g., in the March 2014 Counseling Memorandum. Leighton Decl. Ex. L.

Other assertions of pretext also fail. One assertion, that "Pogoda told Natofsky that Ulon's evaluations were flaky and would be rejected," Pl.'s Opp'n at 7, is conclusory and unintelligible. Another assertion in Natofsky's opposition brief, that "Gill Hearn instructed Ulon not to target Natofsky," is wholly unsupported by

the evidence to which Natofsky cites.[8]  See Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004) (the Court "must be satisfied that the citation to the evidence in the record supports the assertion").  Finally, Natofsky asserts that pretext is established by his receipt of two awards and a merit pay increase from Gill Hearn at the end of 2013.  But "differences between supervisors' reviews of an employee's performance are generally insufficient to demonstrate pretext."  Forte, 2015 WL 5820976, at *11.  They would only suffice "when paired with other evidence demonstrating a discriminatory motive," id., and the evidence proffered -- including the evidence in support of Natofsky's *prima facie* case -- simply does not rise to that level.

We have examined the entire record together, see Schnabel v. Abramson, 232 F.3d 83, 90 (2d Cir. 2000), and concluded Natofsky has fallen far short of raising a triable issue that Ulon issued a negative Performance Evaluation motivated solely by disability discrimination.

---

[8] Plaintiff cites to Paragraphs 35 and 36 of his 56.1 Statement for support. However, Paragraphs 35 and 36 merely say: "35. Admitted, except that Gill Hearn requested to meet with Ulon after Natofsky expressed his concerns to Gill Hearn. 36. Disputed.  Ulon and Gill Hearn discussed Plaintiff's hearing disability during their meeting.  Gill Hearn called the meeting and brought the issue of Plaintiff's hearing disability up and explained that he had hearing issues and focusing issues and Gill Hearn told Ulon that she wanted her to be aware of these issues."

### c. Demotion and Salary Cut

On May 20, 2014, Natofsky received a letter stating that he had been demoted and his salary cut accordingly. His original job position was ultimately broken out into two positions and filled by two non-disabled employees. Natofsky has met his burden at the first stage of the *McDonnell Douglas* framework because "the mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination at the *prima facie* stage . . . ." Zimmermann v. Assocs. First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001).

In response, defendants produce evidence that Natofsky was reassigned as part of a wider reorganization under a new mayoral administration, see, e.g., Defs.' 56.1 Stmt. ¶ 154, pursuant to which Ulon, too, would have been reassigned had she not decided to leave. Furthermore, defendants produce evidence that Peters and Pogoda were frustrated by Natofsky's performance. See, e.g., Defs.' 56.1 Stmt. ¶¶ 72-78. It is "undoubtedly true" that a reorganization constitutes a legitimate non-discriminatory reason for an employment decision, Maresco v. Evans Chemetics, Div. of W.R. Grace & Co., 964 F.2d 106, 111 (2d Cir. 1992), as does "poor work performance," Auguste, 593 F. Supp. 2d at 666. Therefore, defendants have met their burden of production at the second stage.

Natofsky fails to meet his burden of persuasion at the third stage for the simple reason that *Peters* was the one to demote

30

Natofsky, Pl.'s 56.1 Stmt. ¶ 109, and there is no evidence whatsoever that Peters did so for discriminatory reasons. All that Natofsky offers in that regard is an allegation that Peters knew of Natofsky's disability. Pl.'s 56.1 Stmt. ¶¶ 193-95. Plaintiff "has done little more than cite to his alleged mistreatment and ask the court to conclude that it must have been related to his [disability]. This is not sufficient." Grillo v. N.Y. City Transit Auth., 291 F.3d 231, 235 (2d Cir. 2002) (internal quotation marks omitted and alterations incorporated).

In an effort to establish pretext, Natofsky argues that Peters and Pogoda manufactured the justification of poor performance only after litigation began. Pl.'s Opp'n at 15-16. Natofsky mainly argues that his performance was in fact excellent and that criticisms thereto were not asserted until after he sued. See Pl.'s Opp'n at 16. This argument is refuted by contemporaneous documentary evidence of Pogoda's frustrations with Natofsky, see Defs.' 56.1 Stmt. ¶¶ 73-76, and testimonial evidence of Peters's frustrations with Natofsky, see Defs.' 56.1 Stmt. ¶¶ 72, 78,[9] and further weakened by the fact that the defendants had no legal duty to inform Natofsky of their criticisms of his work. Additionally, Natofsky offers no evidence to rebut the defendants' other non-

---

[9] Ulon's Counseling Memorandum and negative Performance Evaluation also broadly support the proposition that Natofsky's performance issues preceded his lawsuit.

31

discriminatory rationale, which is that DOI underwent a reorganization.

Natofsky further relies on allegations regarding *Pogoda's* supposed fixation on the physical markers of Natofsky's disability, which Natofsky alleges shows her discriminatory animus. Even if this were sufficient, Natofsky concedes that Pogoda was not the one who decided to demote Natofsky. See Defs.' 56.1 Stmt. ¶ 109; Pl.'s 56.1 Stmt. ¶ 109. While Natofsky offers no argument as to why Pogoda's alleged discriminatory intent should be imputed to Peters, the Court *sua sponte* has considered two and rejected them. First, while Bickerstaff v. Vassar College, 196 F.3d 435 (2d Cir. 1999), stated that "the impermissible bias of a single individual . . . may taint the ultimate employment decision in violation of Title VII . . . even absent evidence of illegitimate bias on the part of the ultimate decision maker," id. at 450, we conclude that this statement does not apply to Rehabilitation Act cases. The Second Circuit's language was limited to Title VII, and this Court has not found any case applying Bickerstaff to the Rehabilitation Act. What is more, the Supreme Court has since drawn a clear distinction between cases brought under Title VII -- which by its text permits a mixed-motives analysis -- and cases brought under other statutes with stricter language, which require a but-for analysis. Gross v. FBL Fin. Servs., Inc., 557 U.S. 167 (2009). The Rehabilitation Act

falls under the latter category.  <u>Gross</u> and <u>Bickerstaff</u> thus fit neatly together:  while the bias of a non-decisionmaker may be an actionable "motivating factor" under Title VII, it is not by itself enough under the Rehabilitation Act, which requires impermissible bias to be the *sole* reason for the adverse employment action. Therefore, <u>Bickerstaff</u> has no application here.

Second, we conclude that there exists no "cat's paw" liability in this case.  "Cat's paw" liability "refers to a situation in which an employee is fired or subjected to some other adverse employment action by a supervisor who himself has no discriminatory motive, but who has been manipulated by a subordinate who does have such a motive and intended to bring about the adverse employment action . . . ."  <u>Vasquez v. Empress Ambulance Serv., Inc.</u>, 835 F.3d 267, 272 (2d Cir. 2016).  Yet "an employer who, non-negligently and in good faith, relies on a false and malign report of an employee who acted out of unlawful animus cannot, under this 'cat's paw' theory, be held accountable for or said to have been 'motivated' by the employee's animus."  <u>Id.</u> at 275. <u>Vasquez</u>, too, was a Title VII case, and we doubt that cat's paw liability could be extended into the Rehabilitation Act context for the reasons described above.  But even if it could, and even if Pogoda could be said to have acted out of unlawful animus, Natofsky presents no evidence that Peters acted out of anything but good faith in making his demotion decision.  <u>See</u> Defs.' 56.1

Stmt. ¶ 78 ("I had been frustrated with his performance. I had expressed that frustration to Susan Pogoda. In addition, we were doing significant reorganization of the agency . . . ."). Therefore, cat's paw liability does not attach here.

For these reasons, Natofsky has failed to raise a triable issue that his demotion and attendant salary cut were solely motivated by disability discrimination as required under the Rehabilitation Act.

### 2. Failure to Accommodate Claim

Natofsky further alleges that the defendants failed to accommodate his disability. "An employee suing for failure to make reasonable accommodations must establish four elements to make a *prima facie* case: that (1) the plaintiff is a person with a disability under the meaning of the Act; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, the plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." Quadir, 2016 WL 3633406, at *2 (internal quotation marks omitted and alterations incorporated). Natofsky must also "establish the requisite causal connection between [the employer's] alleged failure to accommodate [his] disability and an adverse employment action." Cusack v. News Am. Mktg. In-Store, Inc., 371 F. App'x 157, 158 (2d Cir. 2010) (citing Parker v. Sony Pictures Entm't, Inc., 260 F.3d 100, 108 (2d Cir. 2001)); see

Parker, 260 F.3d at 108 (noting that this element is "frequently left unstated" because of the way that failure-to-accommodate claims are typically defended, but that it is an element nonetheless). Finally, as with disparate treatment claims, a failure-to-accommodate claim based on a negative performance evaluation can succeed only if the evaluation results in an adverse employment action, see Weber v. City of N.Y., 973 F. Supp. 2d 227, 261-62 (E.D.N.Y. 2013) (collecting cases), and, under the Rehabilitation Act, only if the plaintiff's disability is the sole reason for the action, see Cheung v. Donahoe, No. 11 Civ. 0122 (ENV), 2016 WL 3640683, at *7 n.12 (E.D.N.Y. June 29, 2016) (citing Sedor v. Frank, 42 F.3d 741, 746 (2d Cir. 1994)).

Natofsky's failure-to-accommodate claim pertains to his proposal that, in lieu of multi-tasking on email during a meeting, his secretary could notify him of any urgent matters. Pl.'s Opp'n at 10-12. Natofsky argues that the defendants' silence on the matter and failure to act on the proposal led to the adverse employment action of a "lower . . . evaluation score." Pl.'s Opp'n at 12. A claim premised on Natofsky receiving a lower score than he otherwise would have received is insufficient as a matter of law. It already strains credulity that Ulon was referring to the email-responsiveness-in-meetings issue in the Performance Evaluation. It is pure conjecture that the two out of five score under "Other Managerial Accountabilities" would have been

35

different absent the email-responsiveness issue.  See Leighton
Decl. Ex. H at 762 (other reasons for this score were that "HR and
Budget tasks have not been completed in a timely manner" and
Natofsky had trouble with "[d]eference to supervisor and ability
to take direction").  There is finally no evidence from which to
infer that the score -- lowered or not -- was at all causally
connected to Peters's demotion decision or that Peters even knew
about it, let alone that it was the sole reason for Natofsky's
demotion.  "[I]t is simply not true, we want to emphasize, that if
a litigant presents an overload of irrelevant or nonprobative
facts, somehow the irrelevances will add up to relevant evidence
of discriminatory intent.  They do not; zero plus zero is zero."
Tepperwien v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 572
(2d Cir. 2011) (quoting Gorence v. Eagle Food Ctrs., Inc., 242
F.3d 759, 763 (7th Cir. 2001)).

## C.  Retaliation Claims under the Rehabilitation Act

"To make out a *prima facie* case of retaliation, an employee
must show that the employee was engaged in protected activity;
that the employer was aware of that activity; that the employee
suffered adverse employment decisions; and that there was a causal
connection between the protected activity and the adverse
employment action."  Collins v. N.Y. City Transit Auth., 305 F.3d
113, 118 (2d Cir. 2002) (internal quotation marks and citation
omitted).  Natofsky alleges that he experienced retaliation for

opposing discrimination in his June 2013 complaint to Gill Hearn, the May 8, 2014 Evaluation Appeal, the May 28, 2014 email, and the June 18, 2014 DCAS appeal.

### 1. June 2013 Complaint

First, Natofsky argues that Ulon's March 2014 Counseling Memorandum and May 2014 Performance Evaluation constituted retaliation for his June 2013 complaint to Gill Hearn regarding Natofsky's preferred vacation schedule and work arrival time. Pl.'s Opp'n at 9-10. There is no evidence whatsoever that these events, 9 to 11 months apart, are connected, and we reject Natofsky's arguments to the contrary as entirely speculative. Had Ulon (Natofsky's direct supervisor) wished to retaliate against Natofsky for the June 2013 complaint, she had plenty of opportunities to do so before then.

### 2. Evaluation Appeal

Natofsky next alleges that he engaged in protected activity when he submitted his May 8, 2014 letter to Pogoda appealing the Performance Evaluation (the "Evaluation Appeal"). Pl.'s Opp'n at 21; see Leighton Decl. Ex. V.

Assuming for the purposes of this opinion that the Evaluation Appeal was a protected activity,[10] we reject the alleged

---

[10] It is doubtful that the Evaluation Appeal was a protected activity. In the Evaluation Appeal, Natofsky challenged the procedural irregularities and the merits of the evaluation as recounted in Section I of this opinion. Natofsky's assertions therein can be summarized as follows: (1) the Performance Evaluation was inaccurate and unsubstantiated; (2) the Performance Evaluation was based on

retaliatory actions as insufficiently material, separately or in the aggregate, and as lacking a but-for causal connection.  <u>See</u> <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 68 (2006) ("[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." (internal quotation marks and citations omitted)); <u>Hicks v. Baines</u>, 593 F.3d 159, 165 (2d Cir. 2010) ("[T]he alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently substantial in gross as to be actionable." (internal quotation marks omitted)); <u>Palmquist v. Shinseki</u>, 689 F.3d 66, 74 (1st Cir. 2012) ("[T]he Rehabilitation Act . . . requires retaliation to be the but-for cause of an adverse employment action in order for the plaintiff to obtain a remedy.").

Natofsky alleges a host of retaliatory actions.  Pl.'s Opp'n at 22-24.  He alleges that because of the Evaluation Appeal, (1) on May 20, 2014, he was demoted; (2) on June 6, 2014, Pogoda

---

standards not made known to Natofsky beforehand in violation of protocol; and (3) Ulon's departure impaired Natofsky's ability to mount an appeal.  Nowhere did Natofsky contend, explicitly or implicitly, that Ulon issued a negative Performance Evaluation because of discrimination.  Natofsky mentioned his hearing loss not as evidence of any discrimination but only as an explanation for why Ulon's criticism of his email response time was unwarranted.  <u>See</u> <u>Risco v. McHugh</u>, 868 F. Supp. 2d 75, 111 (S.D.N.Y. 2012) (a plaintiff's request to discuss an employer's remark about the plaintiff's disability is not protected activity).

notified him that he would be reassigned from his private office to a noisy cubicle (and effected that reassignment on June 20, 2014); (3) DOI delayed for a month the salary adjustment to which he was entitled, when evidence suggests that the adjustment could have been made in 24 hours; (4) on September 11, 2014, Pogoda denied the Evaluation Appeal; (5) DOI delayed a union payment initially requested on September 2, 2014; (6) on June 17, 2014, DOI cancelled his direct deposit and gave him paper checks; (7) DOI "demand[ed] for months until he left DOI that Natofsky provide constant explanations about DOI policies and procedures under unreasonable time constraints, under threat of insubordination and false claims about the location of personnel files," Pl.'s Opp'n at 23-24; and (8) on July 22, 2014, Pogoda and Rivera asked him to put his title of "Human Resources Generalist" in his email signature.[11]

Allegations (6), (7), and (8) do not approach the standard for materiality, either standing alone or aggregated with any other conduct. These allegations are non-actionable "petty slights or minor annoyances that often take place at work," in the nature of

_____

[11] Natofsky also asserts the following allegations that we do not consider. First, he asserts that on or about June 16, 2014, DOI "conspir[ed]" to deny his requests for assistance in lifting heavy objects, Pl.'s Opp'n at 24, but Natofsky provides no evidence that he was actually denied the assistance. Second, he asserts that DOI delayed another union payment that he requested on December 10, 2015.  The request occurred over a year and a half after the Evaluation Appeal and a year after he left DOI; the lack of temporal proximity dooms any attempt at a *prima facie* case.

"personality conflicts at work that generate antipathy and snubbing by supervisors and co-workers," Burlington, 548 U.S. at 68 (internal quotation marks and citations omitted). They fail to rise to the level of, e.g., "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." Terry, 336 F.3d at 138.

As for the first five allegations, there is simply no evidence that the Evaluation Appeal was the but-for cause of any of the actions. See Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 846 (2d Cir. 2013) ("'but-for' causation . . . require[s] proof that . . . the adverse action would not have occurred in the absence of the retaliatory motive"). Defendants proffer the following legitimate, non-discriminatory reasons for the actions: (1) Natofsky was demoted because he was a poor performer and because DOI reorganized under a new administration as discussed supra; (2) the transfer to a cubicle was due to Natofsky's removal from his post as Director of Human Resources and Budget, Defs.' Mem. of Law at 23; Defs.' 56.1 Stmt. ¶ 145; (3) the delay in the salary adjustment was because of confusion in the new administration regarding how to process a payroll adjustment, Defs.' 56.1 Stmt. ¶¶ 133-37; (4) the negative evaluation was upheld due to Natofsky's poor performance as discussed supra; and (5) the delay in the union

40

payments occurred because DOI staff was "very busy," Pl.'s 56.1 Stmt. ¶ 284.  Plaintiff simply has no evidence that the actions would not have occurred in the absence of a retaliatory motive. "The temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a *prima facie* case of retaliation . . . , but without more, such temporal proximity is insufficient to satisfy [plaintiff's] burden to bring forward some evidence of pretext." El Sayed v. Hilton Hotels Corp., 627 F.3d 931, 933 (2d Cir. 2010).  Plaintiff's conclusory statement that "the above actions reveal retaliatory motives," Pl.'s Opp'n at 24, is insufficient *ipse dixit*.

### 3.   May 28 Email and June 18 DCAS Appeal

Natofsky finally alleges that he engaged in protected activity in (1) a May 28, 2014 email in which he stated, regarding his demotion and salary cut, "By all accounts it is illegitimate and contrary to law," and (2) in his June 18, 2014 DCAS appeal, as recounted in Section I of this opinion *supra*.  Defendants argue that these are not "protected activities," meaning "actions taken to protest or oppose statutorily prohibited discrimination." Aspilaire v. Wyeth Pharm., Inc., 612 F. Supp. 2d 289, 308 (S.D.N.Y. 2009).  We agree.

Natofsky's complaints that his demotion and salary cut were "contrary to law" are too general to give rise to a retaliation

claim under the Rehabilitation Act.[12]  "While it is unnecessary for an individual to specifically invoke the word discrimination," Lucio v. N.Y. City Dep't of Educ., 575 F. App'x 3, 6 (2d Cir. 2014), the complaint must be made in "sufficiently specific terms so that the employer is put on notice that the plaintiff believes he or she is being discriminated against on the basis of the protected status," St. Juste v. Metro Plus Health Plan, 8 F. Supp. 3d 287, 323 (E.D.N.Y. 2014) (internal quotation marks omitted and alteration incorporated).  Here, Natofsky asserts to the Court that it is "obvious" that his phrase "contrary to law" meant disability discrimination because he is "an openly disabled employee."  Pl.'s Opp'n at 21.  Not only does this bare assertion plainly fail the relevant standard, but it is especially insufficient in this case where Natofsky has also challenged the legality of the same actions as constituting age discrimination and/or violations of the New York City Personnel Services Bulletin. "[A]mbiguous complaints that do not make the employer aware of alleged discriminatory misconduct do not constitute protected activity."  Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC, 470 F. Supp. 2d 345, 357 (S.D.N.Y. 2007).

Accordingly, Natofsky has failed to state any retaliation claim under the Rehabilitation Act.

---

[12] We note, however, that the salary cut was in fact improper.

**D.   NYHRL and NYCHRL Claims**

"The district courts may decline to exercise supplemental jurisdiction over a claim . . . if the district court has dismissed all claims over which the district court has original jurisdiction." 28 U.S.C. § 1367(c)(3).  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine -- judicial economy, convenience, fairness, and comity -- will point toward declining to exercise jurisdiction over the remaining state-law claims." Pension Ben. Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc., 712 F.3d 705, 727 (2d Cir. 2013) (citations and internal quotation marks omitted).  Here, we decline to exercise supplemental jurisdiction over the state and city law claims.  In particular, we note that unlike in many employment discrimination cases brought under other federal statutes, we did not address the NYHRL claims in conjunction with the Rehabilitation Act claims because of uncertainty in the case law as to the overlap between the standards.  See, e.g., Powell v. Delta Airlines, 145 F. Supp. 3d 189, 200 n.6 (E.D.N.Y. 2015) (collecting cases).  The state court is best suited to consider that question.

## III. CONCLUSION

For the foregoing reasons, we grant the defendants' motion for summary judgment as to the Rehabilitation Act claims in full.

43

We dismiss the NYHRL and NYCHRL claims without prejudice to their re-filing in state court. This Memorandum and Order resolves the motion pending at ECF No. 42.

**SO ORDERED.**

Dated:    New York, New York
            August 8, 2017

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

44